IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DENVER D. GARTNER | § | CASE NO. 04-35992 |
| Debtor | § | Chapter 7 |
| | § | |
| CHARLES E. GEBHARDT, TRUSTEE and | § | |
| BAKER HUGHES OILFIELD | § | |
| OPERATIONS, INC. | § | Adversary No. 04-3862 |
| Plaintiffs | § | |
| | § | |
| v. | § | |
| | § | |
| DENVER D. GARTNER | § | |
| Defendant | § | |

**MEMORANDUM OPINION ON OBJECTION TO DEBTOR'S DISCHARGE
FILED BY TRUSTEE AND BAKER HUGHES OILFIELD OPERATIONS, INC.**

This Chapter 7 bankruptcy case arises from a 1997 judgment for $300,000 against the Debtor, Denver D. Gartner (Gartner), for breach of contract with Petroreal, Inc. (Petroreal).  In 2000, Petroreal assigned its judgment against Gartner to Baker Hughes Oilfield Operations, Inc. (Baker Hughes).  In 2001, the 234th Judicial District Court of Harris County appointed a receiver to pursue Gartner for payment on this judgment.  In 2004, Gartner voluntarily filed a Chapter 7 petition hoping to obtain a discharge of this judgment debt and other obligations.  The Plaintiffs, Baker Hughes and the Chapter 7 Trustee, Charles E. Gebhardt (Gebhardt), brought this adversary proceeding objecting to the discharge of Gartner's debts under 11 U.S.C. § 727 (a)(3) and (a)(4)(A).[1]  Counsel for all parties deserve credit for prosecuting and defending against this adversary proceeding efficiently and effectively; this Court very much appreciates their professionalism.

---

[1] Hereinafter, throughout this Memorandum Opinion, Baker Hughes Oilfield Operations, Inc. and Charles Gebhardt are referred to as the Plaintiffs.

## I. CREDIBILITY OF WITNESSES

Gartner is a geologist specializing in oil prospecting. He has acted as a managing executive in at least nine companies. Because he is a well-educated person who is capable of understanding complex scientific and business concepts, it is logical to infer that he understands the difference between truths and lies. *See In re Graham*, 199 B.R. 157, 159-160 (Bankr. N.D. Ohio 1996); *see also In re W. World Funding, Inc.*, 52 B.R. 743, 753 (Bankr. D. Nev. 1985) (noting that the Court may determine whether a witness can discern the difference between truth and lies).

During the trial, Gartner testified on two separate occasions. Both times, he answered questions evasively and ambiguously. Even with questions requiring only simple answers, Gartner responded in a manner that required the Plaintiffs' counsel to ask follow-up questions to ensure that the Court fully understood the facts. For example, when asked how long he had been married to his current wife, Kristine (Mrs. Gartner), Gartner responded that he did not know. This response led Plaintiffs' counsel to refer Gartner to a deposition where he previously testified that he was married in 2002. As another example, Gartner evaded questions regarding the Roget Trust. Though Gartner eventually admitted that his parents own the trust and his twenty-two year old son is the trustee, Gartner was reluctant to reveal this information. Gartner was further disinclined to concede that he appointed his son as trustee almost four years ago when his son was only nineteen years old. Such evasive testimony demonstrates Gartner's attempts to deceive not only Baker Hughes and Gebhardt, but also the Court.

Gartner's testimony at trial also conflicted with the testimony of other witnesses. For example, a private investigator, John Blackburn (Blackburn), testified that he attempted to serve a subpoena on Gartner twenty-two times, and that one of those times Gartner evaded service by speeding through a school zone at approximately fifty-five miles per hour. Blackburn's testimony was clear and precise, and this Court found him to be a very credible witness. In rebuttal, Gartner denied that he ever evaded service of process from Blackburn, and Gartner further denied speeding through a school zone to do so. Gartner's testimony was lackadaisical and not believable.

Plaintiffs' attorneys established Gartner's propensity to lie through evidence of Gartner's pre-petition lies. Gartner testified that he lied on a loan application when buying a car in 2003 by misrepresenting his monthly income, his ownership of a house, and his previous bankruptcy.

Gartner also lied under oath about the ownership of his guns during an oral deposition, taken on April 2, 2002, before David Livingston (Livingston), the first state court-appointed receiver for Baker Hughes' judgment against Gartner.  During this deposition, Livingston asked Gartner if he owned any guns.  Gartner replied that he owned only a pistol.  Livingston then asked Gartner if he owned any rifles or shotguns, to which Gartner replied that he did not.  However, when he filed Schedules shortly after filing his Chapter 7 petition, Gartner disclosed that he, in fact, owned a Winchester, a Smith & Wesson, and a Remington (7 mm) pistol.  During an oral deposition, taken by the Plaintiffs' attorneys on March 25, 2005, Gartner also openly admitted that he had owned a pistol, a rifle, and a shotgun at the time when Livingston took his pre-petition deposition on April 2, 2002.  Thus, Gartner lied on previous occasions, including instances where he was under oath.  Gartner's testimony regarding his pre-petition lies undermined his credibility when testifying at trial.

Gartner further demonstrated his lack of respect for the bankruptcy proceedings and the judicial process by failing to stay attentive and alert during the trial.  All in all, because of Gartner's pattern of deception, ambiguity, and apparent disinterest in the proceeding, the Court finds him not credible and gives very little weight to his testimony.[2]

Gebhardt is a certified public accountant who has served as a Chapter 7 trustee in at least four previous bankruptcy proceedings.  During his testimony at trial, he gave very clear and concise answers.  His demeanor on the stand underscored his truthfulness and credibility.  As a result, the Court gives substantially more weight to Gebhardt's testimony than to Gartner's testimony.

## II. FINDINGS OF FACT

The facts, either as stipulated to or admitted by counsel of record, or as adduced from the testimony of the witnesses and introduction of exhibits, in chronological order, are as follows:

1. Gartner graduated from the University of Southern California in 1977 with a Bachelor of Science Degree in Geology.  The following year, Gartner began working for Ferguson & Bosworth, an oil-prospecting firm located in Bakersfield, California.  He

---

[2] ". . . due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed. R. Civ. P. 52 (a).

moved with the company to Houston, Texas in 1981 and continued working for Ferguson & Bosworth until 1983.

2.  In 1983, Gartner took a position with A.L. Ballard until 1988.  While working for Ballard, Gartner acquired a membership to the Houston Center Health Club,[3] and his monthly bills were generally $300.  Gartner was still a member of this club as of his filing for Chapter 7 in 2004.

3.  In 1988, Gartner left A.L. Ballard to become president of West Star Oil Company. Gartner owned at least 5% of this company's stock.

4.  In 1988, Gartner voluntarily filed a Chapter 7 bankruptcy petition.  The bankruptcy court granted him a discharge in 1989.

5.  Petroreal obtained a judgment for $300,000 against Gartner in 1997. (D. Ex. 1).

6.  Between the years of 1988 and 2004, Gartner held a position as either an officer, director, manager, or holder of at least 5% of the voting or equity securities for a number of companies.  These companies included West Star Oil Company (1988-2002), Stoneham Oil Company (1990-2002), Producers Energy Corporation (1992-2003), Stoneham Production Company (1993-2002), Quemado Energy, LLC (1998-2003), Dakota Exploration and Production (1999-2002), USOILCO, LLC (2000-2003), and The Elite Drilling Company, LLC (2001-2004). (D. Ex. 6).

7.  Gartner served as the manager of Elite Drilling.  The Roget Trust, of which Gartner's twenty-two year old son serves as trustee, completely owns Elite Drilling.

8.  On February 29, 2000, Petroreal assigned its judgment against Gartner to Baker Hughes. (D. Ex. 1).

9.  On March 14, 2000, Gartner conveyed his home at 2210 Forest Garden, Kingwood, Texas to his parents.  (D. Ex. 11).

10. On April 30, 2000, Gartner executed a promissory note to his parents to pay the mortgage of his home.  The note required him to make monthly payment to his parents, who used the funds to pay the holder of the lien on this real property.  (P. Ex. 12).

11. In 2000, Producers Energy Corporation, of which Gartner was a managing executive, defaulted on eight months of its lease payments to the office-building owner.  As a

---

[3] Since Gartner acquired his membership, the club has changed its name to The Downtown Club.

result, the landlord locked Gartner and the company out of the office, which was located at One Allen Center in Downtown Houston. Gartner only retrieved a portion of the records he stored in the building and allowed the landlord to discard the rest of them.

12. On February 19, 2001, a court order appointed Livingston as receiver for Gartner's assets and also listed items for Gartner to turn over to Livingston.[4] Livingston was responsible for determining Gartner's financial condition and ensuring that Gartner paid the judgment against him held by Baker Hughes. (D. Ex. 1)

13. On April 30, 2001, Gartner renewed and amended his promissory note to his parents. (P. Ex. 12).

14. On April 2, 2002, Livingston took Gartner's oral deposition. (D. Ex. 2).

15. On April 28, 2003, when applying for a car loan, Gartner represented on the loan application that he owned his own home (i.e. 2210 Forest Garden), had never before filed bankruptcy, and had a monthly salary of $8,000. During the 341 creditors' meeting and also at trial, Gartner admitted these representations were false. (P. Ex. 1, 43).

16. On November 12, 2003, Charles Aycock (Aycock) replaced Livingston as the state court receiver.

17. On April 23, 2004, Gartner voluntarily filed a Chapter 7 petition. Gartner filed his original Schedules and Statement of Financial Affairs on May 19, 2004. A 341 meeting was held on June 17, 2004, and Gebhardt, in his capacity as Chapter 7 Trustee, questioned Gartner under oath. (P. Ex. 13, 43).

18. In 2004, prior to filing his Chapter 7 petition, Gartner rented a storage unit at Affordable Climate Controlled Storage (Affordable). During this rental period, Gartner defaulted on his monthly payments for that unit. On June 24, 2004, after Gartner filed his petition, James Jameson (Jameson), Gartner's attorney at that time, sent a letter to Affordable notifying them of Gartner's bankruptcy and demanding that Affordable not foreclose on Gartner's rental storage unit.

---

[4] The Honorable Ross Sears, a visiting judge of the 234th Judicial District Court of Harris County, Texas, signed this order.

19. On July 28, 2004, Susan Jones, owner of Affordable, notified Gartner by letter that Gebhardt, in his capacity as Chapter 7 Trustee, had rejected Gartner's lease with Affordable and that Affordable would foreclose on Gartner's rental unit.  Affordable foreclosed on that unit in October 2004.  The contents of the unit contained over twenty boxes of records.  Neither Gartner nor anyone on his behalf requested that Affordable not dispose of the documents.  The manager of Affordable disposed of all contents of the unit after the foreclosure.  (D. Ex. 14, 15).

20. On July 24, 2004, the Chapter 7 Trustee's attorney, Alan Gerger (Gerger), sent a letter to Jameson requesting that Gartner produce twenty-one more documents or give explanations as to why such documents cannot be produced. (P. Ex. 14).

21. On August 4, 2004, Gerger sent another letter to Jameson requesting more information regarding Elite Drilling to use during the Rule 2004 Examination of Gartner. (P. Ex. 14).

22. On September 12, 2004, Mrs. Gartner sent a letter to Jameson saying that Gartner and she had not produced the documents which Gerger requested because they were waiting to see if the Court would grant Plaintiffs' request to extend the deadline to file a 727 complaint.  (D. Ex. 16).

23. On September 21, 2004, Jameson notified Gebhardt that certain information was available for Gebhardt to pick up. (D. Ex. 17).

24. On October 31, 2004, the Downtown Club mailed Gartner an invoice listing particular charges from that invoice period and requesting payment on Gartner's outstanding balance.  The invoice included such expenses as a breakfast charge and reflected that Gartner continued to use this membership after filing his bankruptcy petition.  (D. Ex. 9).

25. On March 25, 2005, Plaintiffs' attorneys took the first part of Gartner's oral deposition.  Based on Gartner's original Schedules disclosing that he owned three firearms, these attorneys asked Gartner whether he owned any rifles or shotguns.  During that deposition, Gartner admitted to lying during the pre-bankruptcy deposition with Livingston about his ownership of shotguns and rifles.  (P. Ex. 13, 42, 47).

26.  On April 1, 2005, Mrs. Gartner filed a protective order against Gartner after a fight where Gartner committed acts of family violence.  (D. Ex. 20).

27.  On April 21, 2005, Gartner gave the second part of his oral deposition.  (P. Ex. 48).

28.  On April 22, 2005, Plaintiffs, by virtue of a subpoena, obtained eighty-six boxes of documents from Gartner's residence at 2210 Forest Garden.  (P. Ex. 44).

29.  On April 25, 2005, Mrs. Gartner gave her oral deposition.  (P. Ex. 46).

30.  Gartner amended his Statement of Financial Affairs on May 12, 2005.  Notable changes from his original submission included item "14. Property of Another Person."  The original submission contained a check in the box marked "None," and the amended Statement included a 1995 Cadillac STS and a 1976 Cadillac Eldorado. The amended Statement set forth that Elite Drilling owns the 1995 automobile and that a Mr. Venci Stanev owns the 1976 automobile.  The actual title for the 1995 automobile belongs to Mack Gilbert, and the actual title for the 1976 Cadillac Eldorado belongs to Gartner.  Both automobiles are regularly parked at the 2210 Forest Garden house.  (D. Ex. 4, 6).

31.  Gartner stored Elite Drilling's records at his residence, but he did not include these records in the original or amended Statement.  (D. Ex. 4, 6).

32.  In both the original and amended Statement, item "1. Income from employment or operation of business," Gartner listed $15,000 for the years 2002 and 2003.  In addition, he listed only $3,000 as his year-to-date income for 2004.  Gartner stated that he did not earn any income for the years 2000 and 2001.  (D. Ex. 4, 6).

33.  In his original and amended Statement, item "16.  Spouses and Former Spouses," Gartner included his current wife, Kristine Gartner, whom he married in 2002. Neither his original nor amended Statement included his ex-wife, Brenda Gartner, to whom Gartner was married within the six-year period before filing bankruptcy on April 23, 2004.  (D. Ex. 4, 6).

34.  In his original Statement, item "18. Nature, location and name of business," Gartner checked the box marked "None."  However, in the amended Statement, Gartner added West Star Oil Company, Stoneham Oil Company, Stoneham Production Company, Producers Energy Corporation, Quemado Energy, L.L.C., Elite Drilling

7

Company, L.L.C., Dakota Exploration and Production, and USOILCO, L.L.C.  (D. Ex. 4, 6).

35. Gartner was a managing partner and consultant for Triton American Energy Corporation, which he did not include in item 18 of either the original or amended Statement. (D. Ex. 4, 6).

36. In his original Statement, item "19. Books, records and financial statements," Gartner checked the box marked "None" for all four sub-sections.  However, in the amended Statement of Financial Affairs, on part "c" of question 19, Gartner disclosed that his records were located at four different locations.  These locations include his home at 2210 Forest Garden, his storage unit at Affordable, a box of records he produced for Livingston, and the former offices of Producers Energy at One Allen Center.  Gartner noted in his amended Statement that he lost some of the records when eviction occurred from the One Allen Center office.  (D. Ex. 4, 6).

37. Gartner amended his Schedule B on May 12, 2005 to disclose eighty-six boxes of geological data, which he kept at his residence, interests in several companies, and his health club membership.  He did not disclose these assets in his original Schedule B. He also amended Schedule C to claim as exempt assets all of this geological data, the company stock interests, and the health club membership.  All of the geological data or licenses to the data belong to other corporations for which Gartner previously worked.  (D. Ex. 6).

38. Gartner failed to indicate on his original or amended Schedule G that he had a contract with Elite Drilling for payment as manager.   (D. Ex. 3, 6).

39. Gartner did not list any on-going leases in either his original or amended Schedule G, but he has paid rent to his parents for his residence at 2210 Forest Garden and was also leasing a storage unit from Affordable at the time he filed his Chapter 7 petition. (D. Ex. 3, 6).

40. Gartner both read and signed under penalty of perjury the initial and amended Schedules and Statements of Financial Affairs, and he testified that he understood that he was representing that the information was true and correct.  (P. Ex. 13; D. Ex. 6).

41.   Gartner has not filed a federal income tax return since 2000 because he does not believe that he earned enough income to require him to file.

## III.   CONCLUSIONS OF LAW

### A.   Jurisdiction and Venue

This Court has jurisdiction pursuant to 28 U.S.C. § 157 (a) and § 1334 (a).   This suit is a core proceeding under 28 U.S.C. § 157 (b)(2)(J) and is proper pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. § 1409 (a).

### B.   False Oath or Account May Act to Bar a Discharge Under Chapter 7.

Any debtor who files a Chapter 7 petition has a continuous, affirmative duty to disclose the following in a complete and accurate manner:  (a) a list of creditors; (b) schedules of assets, liabilities, current income, and current expenditures; and (c) a statement of financial affairs.  *In re Coastal Plains*, *Inc.*, 179 F.3d 197, 208 (5th Cir. 1999).   To successfully object to the discharge of Gartner's debts under section 727 (a)(4)(A), the Plaintiffs have the burden of proving that: (1) Gartner made a statement under oath; (2) the statement was false; (3) Gartner knew the statement was false; (4) Gartner made the statement with fraudulent intent to deceive; and (5) the statement related materially to the bankruptcy case.  *In re Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992).  False oaths may be in the form of either false statements or omissions on the schedules and statement of financial affairs or false statements by the debtor during the course of the bankruptcy proceedings.  *Id.*

#### 1.   Gartner Made Statements Under Oath, These Statements Were False, and Garter Knew Them to be False.

Gartner unequivocally admitted to reading the original Schedules and Statement of Financial Affairs before signing them.   Nevertheless, Gartner subsequently amended his Schedules and Statement of Financial Affairs to include assets, liabilities, and various other required information that he omitted from his original Schedules and Statement.  Gartner further admitted he knew that his signature on the original Schedules and Statement affirmed under

9

penalty of perjury that the information in his original Schedules and Statement of Financial Affairs was true and correct.   By omitting the information that he did, Gartner affirmatively made false statements that the undisclosed information did not exist.   *See In re Bilstat, Inc.*, 314 B.R. 603, 610 (Bankr. S.D. Tex. 2004).   Thus, the information omitted in the initial Schedules and Statement of Financial Affairs, along with the false testimony Gartner gave during post-petition depositions, all constitute statements that Gartner made under oath with knowledge that they were false.

### a.   Annual Income for Previous Years

False statements Gartner made under oath include his understated annual income on both the original and amended Statements of Financial Affairs.   For the years 2002 and 2003, Gartner disclosed his income to be $15,000.   For the year-to-date income for 2004, Gartner listed only $3,000.   Based on the evidence and testimony during the trial, the Court finds that Gartner understated his annual income.   Gartner admitted, and this Court finds, that his contract with Elite Drilling included payments of approximately $8,000 per month, or $96,000 annually.[5]   Yet, in both his initial and amended Statements of Financial Affairs, Gartner disclosed $15,000 of annual income for 2002 and 2003.   This gross discrepancy alone demonstrates not merely the existence, but also the degree, of falsity in Gartner's statements made in his testimony at trial as well as his Statement of Financial Affairs, both of which were under oath.

In addition, Gartner performed favors for his colleagues and friends in exchange for return favors.   An example of these return favors is Gartner's friend or colleague paying Gartner's health club membership dues.   The favors received by Gartner constitute income, and he failed to include this income in the figures he set forth in his Statement of Financial Affairs.   In light of the compounded evidence introduced at trial, it is apparent that Gartner's $15,000 yearly income as stated on his Statement of Financial Affairs is understated and therefore false.   Monthly income from Elite Drilling of $8,000, in addition to favors from Gartner's friends and colleagues, equal an income in excess of $96,000 per year, which means that Gartner earned substantially more annual income than the $15,000 figure he disclosed in

---

[5] While Gartner lied about his previous bankruptcy and house ownership on his 2003 car loan application, the Court finds, based on the testimony of the witnesses and certain exhibits, that Gartner's monthly income figure of $8,000 (as represented in the loan application) is more accurate than the figures set forth on Gartner's Schedules and Statement of Financial Affairs.

both his initial and amended Statements of Financial Affairs.  Because Gartner signed both the original and amended Statements of Financial Affairs under oath and penalty of perjury, he has made false oaths knowingly with respect to his annual income in previous years.

### b.   Current Monthly Income

Gartner has also understated his monthly income in his Schedule I.  Gartner's Schedule I shows monthly income of $2,100.  Although Gartner testified that he earns only an average of $1,000 per month and receives an additional $1,000 to $1,100 per month in reimbursements from Elite Drilling, there was sufficient evidence to negate this claim or prove its falsity.  In his 2003 application for an automobile loan, Gartner claimed to earn $8,000 per month.  In addition, Gartner's executory contract with Elite Drilling estimated a figure closer to the $8,000 per month salary as claimed on the loan application.  If the figure of $8,000 as set forth in the loan application and contract is accurate, then Gartner's monthly income is substantially more than the $2,100 aggregate amount set forth in Schedule I.  Assuming, however, that the $8,000 figure set forth in the loan application is, in fact, a lie, and that Gartner's monthly income is only $2,100, then it is worth noting that the monthly income Gartner disclosed on Schedule I adds up to $25,200 annually.  Hence, even if the $2,100 aggregate figure which Gartner set forth on Schedule I was a *correct* amount for his monthly income, the annualized income figure of $25,200 *cannot be reconciled* with the $15,000 annualized income figure that Gartner set forth in his initial and amended Statements of Financial Affairs.  This discrepancy underscores the *utter disregard* Gartner has for truthfulness and accuracy.

Nevertheless, this Court finds that his monthly income was $8,000, which would make his actual annual income at least $96,000, an amount greatly in excess of either the $15,000 *or* the $25,200 figure.  Based on Gartner's lack of credibility, together with the additional evidence and testimony at trial, the Court concludes that the $2,100 per month income set forth in Schedule I is another example of a false oath.

### c.   Business Relationships in the Statement of Financial Affairs

Another false oath Gartner made on his Statement of Financial Affairs includes his omission of eight businesses from his original Statement on item number 18.  The question is quite clear and requires the debtor to include information regarding businesses

> in which the debtor was an officer, director, partner, or managing
> executive … within the six years immediately preceding the
> commencement of this case, or in which the debtor owned 5
> percent or more of the voting or equity securities within six years
> immediately preceding the commencement of this case.

(P. Ex. 13).  In Gartner's original Statement of Financial Affairs, he checked the "None" box and did not list any businesses.  However, almost one year after his initial filing and following two depositions where the Plaintiffs questioned Gartner about these business entities, Gartner amended his Statement to include eight corporations.  These corporations included West Star, Stoneham Oil, Stoneham Productions, Producers Energy, Quemado Energy, Elite Drilling, Dakota Exploration, and USOILCO.  Gartner knew the extent and time frame of his relationships with each of these entities.  His failure to list them on his initial Statement is another example of a false oath Gartner knowingly made.

### d.  Business Interests and Assets in the Schedules

Yet another example of a false oath Gartner made knowingly is his omission of his interest in incorporated and unincorporated businesses.  Question number 12 of Schedule B required Gartner to disclose this information.  Nevertheless, on his initial Schedules, which he filed May 19, 2004, Gartner checked "None" rather than divulging information regarding his business interests or stock ownership.  Almost one year after the initial filing of Gartner's Schedules and following two depositions when Plaintiffs asked Gartner about any interest he may own in any businesses, Gartner amended his Schedules to include his interests in seven businesses.  These businesses include USOILCO, Dakota Oil & Gas, West Star Oil, Producers Energy, Stoneham Oil, Stoneham Productions, and Quemado Energy.[6]  Once again, Gartner knew of his interests in these companies when he omitted them from his initial Schedules.  Furthermore, Gartner's amended Schedule, also signed under penalty of perjury, still failed to include his interests in both Elite Drilling and Triton American Energy.  These omissions on both Gartner's initial and amended Schedules are also false oaths.

---

[6] Amended Schedule B actually lists "Quenado Energy."  However, this appears to be a mistake intending to include "Quemado Energy."

### e.    Leasing of House

Although Gartner may not own the real estate located at 2210 Forest Garden,[7] he admitted to paying some rent to his parents for the house. Gartner estimated the house mortgage payments to be approximately $2,000 per month. Mrs. Gartner's testimony at her deposition indicated that Gartner paid rent to his parents for living in the house. While there was no evidence of the actual terms of the lease, it was clear through the testimony and evidence that some type of lease agreement existed. Yet, Gartner failed to include this lease in both his original and amended Schedule G. Gartner's failure to include this lease on his Schedules is another example of a known omission, which constitutes a false oath.

### f.    Health Club Membership

Another item Gartner omitted from his initial Schedules is his membership with the Downtown Club. Gartner acquired this membership over twenty years ago while working with A.L. Ballard when the club was called the Houston Center Club. Monthly charges for Gartner were approximately $300 when Gartner filed his bankruptcy petition in April of 2004. Although Gartner amended his Schedules to include this membership, his initial omission constitutes another false oath. His attempt to excuse this omission because he did not believe it was an asset is also without merit. This membership not only is an asset, but it further evinces Gartner's understated yearly income. At fees totaling approximately $3,600 per year,[8] Gartner would have a difficult time paying for membership fees totaling twenty percent of his alleged annual income of $15,000.[9] Gartner further testified that his friends and colleagues paid for his membership dues in exchange for favors Gartner performed for them. However, Gartner did not list these "favors" as executory contracts, nor did he list the payments by his friends and

---

[7] The deed conveying Gartner's house to his parents (P. Ex. 9), which both Gartner and his former wife, Brenda Gartner, signed on March 14, 2000, proves the falsity of Gartner's representation in the 2003 loan application that he owned the 2210 Forest Garden house.

[8] $300 per month x 12 months = $3,600 per year.

[9] Gartner represented in his Statement of Financial Affairs that his annual income in 2002 and 2003 was $15,000. Membership fees of $3,600 are a significant percentage of this income. In addition, Mrs. Gartner testified that rent paid to Gartner's parents is approximately $2,000 per month, and she further noted in her deposition that Elite Drilling paid only a portion of the rent—$750 per month; thus, Gartner himself was paying $1,250 per month to his parents for rent. These two expenses alone ($1,250 + $300) total $1,550 per month—$18,600 per year. Because Gartner continued to pay these monthly expenses until the eight or nine months prior to filing his Chapter 7 petition, the Court finds that (a) Gartner's annual income could not have been a figure as low as $15,000; and (b) his annual income was substantially greater than the $15,000 he set forth in both his initial and amended Statements of Financial Affairs.

colleagues as income.  As a result, by excluding this information, either Gartner is concealing his actual income or failing to include other sources of income, both of which constitute false oaths.

### g.   Books and Records Omitted from the Statement of Financial Affairs

Gartner also failed to include on question number 19 of his initial Statement of Financial Affairs that others were in possession of his records.  However, at the time of filing Gartner's bankruptcy petition, Gartner knew that he left records pertaining to Producers Energy[10] in that company's office when eviction occurred.  In addition, Gartner knew that Livingston still held at least one box of records.  Finally, Gartner knew that he stored approximately twenty boxes of records and documents at Affordable when he filed his petition.  Yet, in his original Statement of Financial Affairs, he checked the "None" box in response to a question clearly requiring him to list "all firms or individuals . . . in possession of books of account and records of the debtor."  Once again, Gartner amended his Statement nearly one year later and following two depositions where he testified to knowing of such records in possession of others.  Nevertheless, Gartner's failure to inform Gebhardt through the initial Statement of Financial Affairs that other individuals or companies held records or financial documents is another example of a false oath.

### 2.   Gartner Made His False Statements With Fraudulent Intent.

The next element of the *Beaubouef* test requires the Plaintiffs to establish that Gartner made his statements with fraudulent intent.  *Beaubouef*, 966 F.2d at 278.  In *Beaubouef*, the bankruptcy court denied the defendant's discharge because he failed to list his status as an officer with a company.  *Id*. at 178.  The debtor knew he had such an interest in that company six years prior to filing his Chapter 7 petition.  *Id*.  Six months after a 2004 examination, the debtor amended his Schedules but still failed to list his interest in yet another company.  *Id*.  In upholding the denial of discharge, the Fifth Circuit noted that it could not deny the discharge merely for honest mistakes.  *Id*. (citing 4 Collier on Bankruptcy, ¶ 727.04[1A]).  However, the Fifth Circuit held that there was sufficient evidence of the debtor's reckless indifference to the truth based on "the existence of more than one falsehood, together with [the defendant]'s failure to take advantage of the opportunity to clear up all inconsistencies and omissions when he filed

---

[10] While these records may not have included information about Gartner directly, Gartner owned an interest in Producers Energy and was a managing officer of the corporation.  Moreover, Producers Energy was governed by a Board of Directors consisting of only one person, Patrick Dozark.  In addition, Gartner appointed his wife Brenda Gartner—now ex-wife—as the registered agent for the corporation.  Thus, these records pertaining to Producers Energy would have been material to determining Gartner's financial situation.

his amended Schedules." *Beaubouef*, 966 F.3d at 178 (citing *In re Sanders*, 128 B.R. 963, 972 (Bankr. W.D. La. 1991)).

Like the debtor in *Beaubouef*, Gartner failed to list any of his business relationships in his original filings. Similar to the debtor in *Beaubouef*, Gartner only amended his Statement of Financial Affairs and Schedules months after a deposition taken by the Plaintiffs' and over one year after Gartner's initial filing.

Additionally, even Gartner's amended filing failed to disclose Brenda Gartner as a former spouse, his executory contract with Elite Drilling, and his outstanding lease with his parents for the 2210 Forest Garden house. Furthermore, Mrs. Gartner's letter to Jameson, dated September 12, 2004, demonstrated Gartner's fraudulent intent in making these false oaths. In that letter, Mrs. Gartner explained that Gartner and she were holding off producing documents to the Plaintiffs pending this Court's decision as to whether to extend the deadline for the Plaintiffs to file their objection to Gartner's discharge. Thus, Gartner was deliberately delaying production of documents while simultaneously hoping that this Court would not extend the deadline. In this manner, Gartner could obtain his discharge before producing documents. Even if these documents contained incriminating disclosures, the Plaintiffs, not having seen them, would be unable to use them against Gartner in the wake of him having obtained a discharge. All in all, as in *Beaubouef*, there is sufficient evidence demonstrating Gartner's pattern of falsehoods. Furthermore, Gartner had an opportunity to correct all of these falsehoods, but did not. As a result, the Court concludes that Gartner made his false statements with fraudulent intent.

It is also worth noting that the Fifth Circuit has made it clear that a debtor is not entitled to a discharge where the debtor makes statements under oath with "reckless indifference to the truth." *Sholdra*, 249 F.3d at 382. The Fifth Circuit has held that a showing of reckless indifference to the truth is equivalent to showing the requisite fraudulent intent to deceive sufficient to bar a discharge under 727 (a)(4)(A). *Beaubouef*, 966 F.2d at 178. A debtor who makes more than one false statement under oath with an opportunity to clear up the inconsistencies has demonstrated his recklessness, which is sufficient for the bankruptcy court to infer the debtor's requisite intent. *Id.* Gartner demonstrated his reckless indifference to the truth by failing to give full and complete disclosures in both his initial and amended Schedules and Statements of Financial Affairs. *See id*; *see also Shouldra*, 249 F.3d at 382. As a result,

Gartner's reckless indifference to the truth is sufficient to meet the fourth element of the *Beaubouef* test.

### 3. Gartner's False Statements Are Material to the Bankruptcy Case.

A false oath is material if it relates to the debtor's business transactions or concerns the discovery of assets or business dealings. *Beaubouef*, 966 F.2d at 178 (quoting *In re Chalik*, 748 F.2d 616, 617 (11th Cir. 1984)). A debtor's claim that he omitted an asset because the asset has no value or would not be detrimental to creditors is irrelevant and without merit. *Beaubouef*, 966 F.2d at 178 (quoting 4 Collier on Bankruptcy, ¶ 727.04[1], at 727-59). "Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them." *Chalik*, 748 F.2d at 617 (citation omitted).

In *Beaubouef*, the debtor claimed that he did not list a company in which he previously held an interest because the company no longer did business, it had no customers, and he was merely an employee of the company. 966 F.2d at 179. The Fifth Circuit held this non-disclosure to be a material omission because it constituted information that could have led to the discovery of assets. *Id.* Similarly, the debtor in *Chalik* failed to list in his Schedules and Statement of Financial Affairs twelve corporations in which he owned some interest. 748 F.2d at 618. In later depositions, the debtor disclosed his involvement with these corporations only when the trustee asked him specific questions about these corporations. *Id.* at 619. The court in *Chalik* held these facts to be sufficiently material to bar a discharge under section 727 (a)(4)(A) because the information was necessary to determine the debtor's financial condition. *Id.* The court further held that it was irrelevant whether the interests the debtor omitted had any value at the time the he filed his bankruptcy petition. *Id.*

As did the debtors in both aforementioned cases, Gartner claims that he did not list the nine companies[11] with which he had associations because he did not believe his relationship and interests had any value to creditors, and he did not receive remuneration from these entities. In addition, he maintains that he did not list the numerous boxes of geological data because he believed they had no value. During cross-examination, Gartner continually testified that he did not list certain items on his initial Schedules and Statement of Financial Affairs because he did not think they had any value. However, because these items, which

---

[11] Gartner was an officer, director, partner, or managing executive for each of these nine companies. In addition, he owned at least 5% of the stock interest in these companies.

pertain to other business transactions and relationships, may lead to the discovery of other assets, Gartner's omission of these matters is a material omission.

       Moreover, Gartner's belief that the omitted assets had no value is irrelevant and without merit. *Id.* For example, his amended Statement of Financial Affairs revealed that Gartner still possessed the title to the 1976 Eldorado. Additionally, Gartner failed to disclose Brenda Gartner as his former wife in both his initial and amended Statement of Financial Affairs. Furthermore, Gartner did not disclose Livingston, One Allen Center, or Affordable as businesses or individuals in possession of his personal records. Finally, in his Schedules, Gartner did not disclose his executory contracts and his lease agreement with his parents. All of the above-referenced non-disclosures are material omissions of assets that would have been ascertained had Gartner included these assets on his original Schedules and Statement of Financial Affairs. All in all, even though Gartner failed to divulge information to Gebhardt because Gartner deemed the information as trivial or valueless, this information, when viewed in the aggregate, is sufficiently material to bar a discharge under 11 U.S.C. § 727 (a)(4)(A). Moreover, understating his income to the extent that he did—$15,000 rather than $96,000—is unquestionably material and, therefore, grounds for barring his discharge under 11 U.S.C. § 727 (a)(4)(A).

    **4.**    **Amending Schedules and Statement of Financial Affairs Does Not Excuse False Oaths.**

       The Fifth Circuit has noted that amendments do not excuse false oaths. *Sholdra*, 249 F.3d at 382 (5th Cir. 2001) (citing *Mazer v. United States*, 298 F.2d 579, 582 (11th Cir. 1962)). A debtor's claim that he amended his statement of financial affairs or schedules is further undermined as a defense if he files the amendments only after his deposition reveals such falsity in his original filings. *Sholdra*, 249 F.3d at 382 (citing *Swicegood v. Ginn*, 924 F.2d 230, 232 (11th Cir. 1991) (per curiam)). In *Sholdra*, the debtor filed amendments to his original Schedules one week after his deposition revealed false statements in the original filings. *Sholdra*, 249 F.3d at 381. The court affirmed the denial of discharge based on the false oath, rejecting the defense that the debtor filed amendments. *Id.* at 382. Similarly, in *Beaubouef*, the debtor filed amendments six months after a 2004 examination revealed false statements in his original filings. 966 F.2d at 178. The court in *Beaubouef* was not swayed by the amendments to the Schedules and Statement of Financial Affairs in upholding the denial of the debtor's discharge. *Id.*

Gartner amended his Schedules and Statement of Financial Affairs nearly two months after his deposition revealed his false statements. While this is not quite the six month period present in *Beaubouef*, it is a longer period than *Sholdra*. Furthermore, as *Sholdra* points out, Gartner's amendments do not negate the false statements by omission he made in his original filings. Thus, Gartner's amendments, filed on May 12, 2005, will not suffice as a defense to the Plaintiffs' claim of false oath.

While Gartner's failure to include certain items in his original Schedule or Statement of Financial Affairs appears to be a mere technical defect on its face, the Fifth Circuit does not find such omissions to be so trivial.[12] Even technical defects in Gartner's Schedules and Statement of Financial Affairs constitute material omissions because the disclosure of the information omitted may have assisted Gebhardt in assessing Gartner's financial condition. Furthermore, there were more than a few defects in the initial Schedules and Statement of Financial Affairs. The Plaintiffs complain of, and the Court finds, at least eight instances[13] where Gartner failed to list required information in his Schedules and Statement. Finally, Gartner did not immediately correct these defects, nor did he correct *all* of the omissions when he finally did file the amended Schedules and Statement. As a result, the omissions and defects constitute false oaths sufficient to bar a discharge of Gartner's debts.

**5.     Gartner's Reliance on Attorney's Advice Is No Defense.**

A debtor can defend against claims brought under section 727(a)(4) by asserting reliance on attorney advice. However, this defense is only available where the debtor's reliance was reasonable and in good faith. *In re Dreyer*, 127 B.R. 587, 597 (Bankr. N.D. Tex. 1991) (citing *In re Weber*, 99 B.R. 1001, 1018 (Bankr. D. Utah 1989)). The reasonableness of the debtor's reliance is undermined where the debtor has admitted under oath to having read and signed the Schedules and Statement of Financial Affairs that are challenged in the adversary

---

[12] *See Sholdra*, 249 F.3d at 382 (false oaths include *either* the intent to deceive *or* a reckless disregard for the truth); *see also Beaubouef*, 966 F.2d at 178 (noting that several omissions coupled with the opportunity to make amendments demonstrates more than mere honest mistakes).

[13] The instances are as follows: (1) Gartner understated his income from previous years on his initial and amended Statement of Financial Affairs; (2) he omitted his business relationships in his initial Statement of Financial affairs; (3) he did not disclose his business interests and other assets on the initial Statement of Financial Affairs; (4) he did not disclose the lease with his parents for the 2210 Forest Garden house in either his initial or amended Schedules; (5) he did not list his health club membership as an asset in his initial Statement of Financial Affairs; (6) he also understated his current monthly income in his Schedules; (7) he did not list Brenda Gartner as a former spouse in his initial or amended Statement of Financial Affairs; and (8) he did not disclose other individuals, firms, and companies who possess books and records belonging to Gartner.

proceeding. *Dreyer*, 127 B.R. at 597.  Evidence of the debtor's intent to omit information from the bankruptcy petition undermines the debtor's assertion of good faith.  *Id*. at 598.

In the instant case, Gartner attempted during trial to claim that his false statements and omissions on his initial Schedules and Statement of Financial Affairs were results of his reliance on Jameson, his previous attorney, and on Jameson's legal assistant.  However, the Court does not believe that this reliance was reasonable.  At trial, Gartner admitted to reading and signing both the original Schedules and Statement of Financial Affairs as well as the amended Schedules and Statement of Financial Affairs under penalty of perjury.  Having previously filed for bankruptcy in 1988 and also having served as President of West Star when West Star filed its bankruptcy petition in 1995, Gartner cannot now claim to be ignorant of the process.  Given the number of omissions on both the original and amended Schedules,[14] Gartner's argument that he blindly relied on Jameson and Jameson's legal assistant is unconvincing.  Gartner "must accept responsibility for the information in the statements and Schedules." *Id*. at 597.

Gartner's argument of reliance on his attorney also lacks evidence of good faith. At trial, Gartner admitted to making false statements at his oral deposition concerning his possession of firearms.  He also admitted to lying three times in completing a loan application to procure financing for a vehicle.  Gartner's own admission of his willingness to lie under oath and on a loan application undermines his present claim that the omissions from his original and amended Schedules were the result of honest and innocent reliance.  Furthermore, Gartner amended his Schedules only after inaccuracies were revealed at his deposition.  The decision to amend the Schedules only after untruths are uncovered is evidence of fraudulent intent.  *See Sholdra*, 249 F.3d at 382.   In the present case, the totality of Gartner's omissions, combined with his decision to amend his Schedules and Statement of Financial Affairs only after the omissions were exposed at his oral deposition, evinces fraudulent intent and defeats a defense of good faith reliance on his previous attorney.

---

[14] See previous footnote for a list of omissions and misrepresentations.

C.    **Concealment, Mutilation, or Failure to Preserve Records Also Bar a Discharge Under Chapter 7.**

11 U.S.C. § 727 (a)(3) provides for the prevention of a debtor's discharge when the debtor does not adequately maintain financial records that could assist any creditor or the trustee in ascertaining the debtor's financial situation. *In re Dennis*, 330 F.3d 696, 703 (5th Cir. 2003). The duty to preserve or maintain such records requires the debtor to take "reasonable precautions for the preservation of these records." *In re Devine*, 11 B.R. 487, 488 (Bankr. D. Mass. 1981). The trustee and creditors need such information for, among other reasons, ascertaining whether the estate has non-exempt assets that can be liquidated for payment of claims. *See In re Scott*, 172 F.3d 959, 969 (7th Cir. 1999). Trustees and creditors should not be required to speculate as to the debtor's financial condition or hunt for the debtor's financial information in order to carry out activities such as liquidation efforts. *In re Craig*, 252 B.R. 822, 828 (Bankr. S.D. Fla. 2000) (quoting *In re Caserta*, 182 B.R. 599, 611 (Bankr. S.D. Fla. 1995)); *see also In re Juzwiak*, 89 F.3d 424, 427-428 (7th Cir. 1996).

In order to state a *prima facie* case under section 727 (a)(3), the Plaintiffs must show that: (1) Gartner failed to maintain and preserve adequate records; and (2) such failure makes it impossible to ascertain his financial condition and material business transactions. *Dennis*, 330 F.3d at 703. Additionally, the records that the debtor must disclose need not necessarily provide specific financial information or be organized in a certain manner. *Juzwiak*, 89 F.3d at 428 (citations omitted). Further, section 727 (a)(3) requires the debtor to keep and maintain sufficient records so that "the debtor's financial condition or business transactions *might* be ascertained." 11 U.S.C. § 727 (a)(3) (emphasis added).

Moreover, the standard for the disclosure of records for a sophisticated debtor is higher than that of an unsophisticated debtor. *See In re Goff*, 495 F.2d 199, 201-02 (5th Cir. 1974); *see also Scott*, 172 F.3d at 970. Debtors who engage in sophisticated business practices and who have attained a high level of education are held to a higher standard because they should be more aware of the importance of maintaining and producing important financial records. *Goff*, 495 F.2d at 202. Furthermore, unlike section 727 (a)(2) and (a)(4), both of which include specific language requiring intent or knowledge, sub-section (a)(3) does not include language that requires a showing of intent or recklessness. Because Congress chose not to include words such as knowingly or intentionally in sub-section (a)(3), it follows that the statute does not specifically

require intent. *Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 901 (7th Cir. 2002) (citing *Scott*, 172 F.3d at 969; *Juzwiak*, 89 F.3d at 430).

Once a plaintiff satisfies the elements needed for a *prima facie* case, the defendant has the burden of establishing that his failure to keep adequate records was justified under all circumstances. *Dennis*, 330 F.3d at 703. The debtor may satisfy this burden by demonstrating a lack of sophistication or that the neglected records were not in any way needed to ascertain the financial condition of the debtor. *Id.*

### 1.   Gartner Failed to Prevent Third Party Destruction or Disposal of Documents.

In *Devine*, the debtor's former landlord destroyed the debtor's business records after the debtor vacated the store's premises. 11 B.R. at 488. When the landlord changed the locks, the debtor never returned to request the documents he left inside the store. *Id.* As a result, the court denied the debtor's discharge because the trustee was unable to ascertain the debtor's financial condition in the absence of the records left behind. *Id.* at 489. Similarly in *Hyder*, the debtor could not produce records for the trustee because he allowed them to be destroyed after an audit by the IRS. *In re Hyder*, 11 B.R. 467, 469 (Bankr. D. Mass. 1984). The IRS concluded this audit four years prior to the debtor's filing of his bankruptcy petition. *Id.* The court held that such destruction was not justified and would have assisted the trustee in ascertaining the debtor's financial condition. *Id.* at 472. As a result, the court denied the debtor's discharge. *Id.*

Like *Devine* and *Hyder*, Gartner has failed to prevent the disposal of existing records on at least two occasions. In 2000, Producers Energy, of which Gartner was a managing executive, defaulted on its lease payments while leasing office space at One Allen Center for Producers Energy. When the landlord locked Gartner out of the office, Gartner failed to take steps to retain all records within the office. Gartner then allowed the landlord at One Allen Center to dispose of numerous records pertaining to Producers Energy. Because Gartner was the managing executive for Producers Energy, and he owned an interest in the company,[15] information about this privately-held company might have been necessary to ascertaining Gartner's financial situation.

In 2004, Gartner defaulted on his rent payments to Affordable. Gartner did nothing when Mrs. Jones, Affordable's owner, notified him that Gebhardt, in his capacity as

---

[15] Gartner's amended Schedule B discloses that he owns an interest in Producers Energy.

Chapter 7 Trustee standing in the shoes of the lessee, had rejected Gartner's lease. Gartner had over three months from the time that Mrs. Jones notified him that Affordable would foreclose on the contents of the unit to the time that the manager of Affordable actually discarded the contents. Affordable's manager testified to disposing of approximately twenty boxes all containing records belonging to Gartner. Some of these documents contained information pertaining to Gartner's business relationship with several companies who had licenses to use the geological data in these boxes. This information might have been used to ascertain Gartner's financial situation.

Gartner's argument that he did not intentionally cause the destruction of documents is irrelevant. Section 727 (a)(3) only requires that the debtor "concealed, destroyed, mutilated, falsified, or *failed to keep or preserve any recorded information*, including books, documents, records, and papers from which the debtor's financial condition or business transactions might be ascertained." 11 U.S.C. § 727 (a)(3) (emphasis added). Gartner asserts that Affordable wrongfully destroyed the contents of the boxes by disregarding the automatic stay. These contents, however, were in Gartner's constructive possession for three months before foreclosure efforts commenced. Gartner prevented the Chapter 7 Trustee from acquiring this information by not revealing its existence to Gebhardt and by allowing Affordable to destroy it. Had Gartner initially disclosed Affordable as a holder of records on question 19 of his Statement of Financial Affairs, Gebhardt would have been able to communicate with Affordable and preserve all of these records. Instead, Gartner waited until May 12, 2005 to amend his Statement of Financial Affairs (eight months after Affordable discarded the boxes of records contained in Gartner's storage unit) to disclose Affordable as a holder of records. Under these circumstances, Gartner violated section 727 (a)(3) because he prevented the Chapter 7 Trustee from discovering financial information regarding Gartner's financial condition. Accordingly, Gartner is not entitled to a discharge based on his violations of 11 U.S.C. § 727 (a)(3).

  **2.     Gartner Was Unwilling to Fully Cooperate With the Plaintiffs.**

In addition to the One Allen Center office and the Affordable storage unit, Gartner stored eighty-six boxes of records and geological data in his home. These boxes contained information regarding many of the companies for which Gartner worked over the years. He did not provide this information to Gebhardt even after he was requested to do so. Gartner claimed that some of the data did not belong to him but rather to Elite. Gartner then told

Gebhardt to contact Elite's attorney for access to the data in the boxes. By doing so, Gartner did not fully open his records and allow Gebhardt free access to this information. Furthermore, Gartner's belief that he did not have to produce these documents is irrelevant in this case. The documents in the boxes contained information that could have helped Gebhardt ascertain Gartner's financial position, and Gartner therefore was required to produce the data. *See Dennis*, 330 F.3d at 703. His failure to do so also violates section 727 (a)(3), which provides another basis for denying Gartner's discharge.

### 3. Gartner Failed to File Tax Returns.

Gartner has also failed to file any tax returns since 2000. Tax returns are "quintessential documents" in a personal bankruptcy. *Dennis*, 330 F.3d at 703 (quoting *Nisselson v. Wolfson*, 152 B.R. 830, 833 (S.D.N.Y. 1993)). It is not difficult to discern how a tax return would provide a creditor or a trustee with important financial information about a debtor: it provides substantial personal financial information such as income, expenses, and stock transactions. Again, it is immaterial whether Gartner failed to file these returns intentionally. Gartner's failure to file tax returns provides another basis for denying Gartner's discharge under section 727 (a)(3) because it prevents creditors and trustees from obtaining important financial information. *See Dennis*, 330 F.3d at 703; *see also In re Jacobowitz*, 309 B.R. 429, 437 (S.D.N.Y. 2004) (noting that missing income tax returns create an obstacle for creditors attempting to determine the debtor's financial condition); *see also In re Dias*, 95 B.R. 419, 421-22 (Bankr. N.D. Tex. 1988) (holding that debtor was not entitled to discharge based on failure to maintain books and records such that trustee and creditors could ascertain debtor's financial condition).

### IV.   CONCLUSION

It is in the interest of society "[t]o release an *honest*, unfortunate, and insolvent debtor from the burden of his debts and to restore him to business activity." *White v. Brown Shoe Co.*, 80 F.2d 674, 674-675 (5th Cir. 1929) (emphasis added). The Bankruptcy Code should be construed liberally for those honest debtors. *See id.* However, "a discharge in bankruptcy is a privilege, not a right." *Juzwiak*, 89 F.3d at 427. For the court to grant a debtor a "fresh start," the debtor must be honest and comply with the Bankruptcy Code. *United States v. Cluck,* 87 F.3d 138, 140 (5th Cir. 1996) (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991)). Courts

should deny the privilege of a discharge if the debtor fails to comply with the Code. *Cluck*, 87 F.3d at 140 (citing 11 U.S.C. § 727[16]).

Because Gartner has demonstrated a pattern of deception and dishonesty with the Chapter 7 Trustee, Gartner is not entitled to a discharge. Upon filing his bankruptcy petition in 2004, Gartner had a duty to fully disclose all information that might lead the Trustee to ascertain his financial condition. This duty included listing his business affiliations as required in the Schedules and Statement of Financial Affairs. Gartner's involvement in at least two previous bankruptcies shows that he has experience with completing and filing accurate Schedules and Statements of Financial Affairs.

Beginning with his deposition with the former state court-appointed receiver in 2002, Gartner has knowingly made false oaths concerning his monthly and yearly income, business relationships, business interests and assets, and financial records. This pattern of false oaths continued in this Chapter 7 case with Gartner's testimony at the 341 creditors' meeting and at his depositions, and also with his failure to completely and accurately fill out his initial Schedules and Statement of Financial Affairs. Finally, these statements were material to Gartner's bankruptcy because they affect the assets available for the trustee to disburse to Gartner's creditors. Neither Gartner's alleged reliance on advice from counsel nor his amended Schedules and amended Statement of Financial Affairs excuse his false oaths. Accordingly, Gartner's discharge will be denied pursuant to 11 U.S.C. § 727 (a)(4)(A).

Gartner also had a duty to maintain adequate records so that creditors and the Chapter 7 Trustee could ascertain his financial position. This duty required Gartner to voluntarily produce the records located at his home while preventing the destruction of the boxes at the storage facility and at One Allen Center. Additionally, Gartner had a duty to maintain adequate tax records so that creditors and the trustee could ascertain his financial position. As an educated geologist and businessman, Gartner has no justification for his failure to file tax returns; this is a basic responsibility of all income-earning Americans. *Dennis*, 330 F.3d at 703. Because of his experience and education, the Court holds Gartner to a high standard for record-keeping. Gartner failed in his duty to maintain, protect, and produce these documents. Accordingly, Gartner's discharge will also be denied pursuant to 11 U.S.C. § 727 (a)(3).

---

[16] Subsections (a), (d), and (e).

For the foregoing reasons, this Court sustains the Plaintiffs' Objection to Gartner's Discharge. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law[17] pursuant to FED. R. CIV. P. 52, as incorporated into adversary proceedings in bankruptcy cases by FED. R. BANKR. P. 7052. The Court will issue a separate order consistent with this Memorandum Opinion.

SIGNED this 27th day of June, 2005.

Jeff Bohm
United States Bankruptcy Judge

---

[17] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.